**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| AMERICAN FIRE WIRE, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>RFS TECHNOLOGIES, INC; RFS HOLDINGS GMBH; AMPHENOL CORPORATION; WINDY CITY WIRE, CABLE & TECHNOLOGY PRODUCTS, LLC; and TALLEY LLC,<br><br>Defendants. | Case No. 2:26-cv-923<br><br>JURY TRIAL DEMANDED |

# COMPLAINT FOR PATENT INFRINGEMENT

## INTRODUCTION

1. There has long been an acute need to improve emergency management systems for burning buildings. When a building is on fire and people are trapped inside, life may hinge on whether the first responders can talk to each other, to their team outside, and to the civilians inside they are trying to assist. Inside these buildings, those first responders' communications will generally travel through a network of antennas and cables hidden in the walls and ceilings,[1] and if those antennas and cables fail to hold up to the extreme conditions of the fire, then the communications fail with them.

2. Prior attempts to address this critical need were woefully inadequate, so Will Rogers, the founder of American Fire Wire, Inc. ("AFW"), set out to solve that problem. Rogers trialed different solutions until he found one that worked, and by 2016, Rogers had done what the industry had not been able to: Design the world's first standalone, fire-resistant coaxial cable that

[1] Sometimes referred to as distributed antenna systems, or "DAS."

continues to carry strong signal through two hours of fire at 1,850° F and stands up to the rigorous testing requirements of the National Fire Protection Association code. The United States Patent and Trademark Office recognized Mr. Rogers' breakthrough by awarding multiple patents, including U.S. Patent Nos. 9,773,585 and 10,283,239 (the "Asserted Patents").[2]

3. Mr. Rogers founded AFW to commercialize Mr. Rogers's innovation. As a small, inventor-led company, AFW took Mr. Rogers's pioneering invention to trade shows, and the industry, including RFS Technologies, Inc. ("RFS") in particular, quickly recognized the value of AFW's technology.

4. RFS is a global operation with many employees and substantial sales, yet despite its immense resources, RFS was not able to develop a solution like AFW's. Having failed to develop its own viable solution, RFS went undercover. Between at least approximately 2018 and 2019, RFS employees, including at least Drausio Castro, posed as potential AFW customers in order to learn about AFW's technology. In order to hide their connection to RFS, they signed up to receive AFW's information using personal email addresses. They studied AFW's patented technology, and then, around April 2020, RFS launched its own fire-resistant coaxial cable under the brand name "DragonSkin." DragonSkin is built on the technology RFS stole from AFW.

5. After discovering RFS's brazen behavior, AFW told RFS directly that DragonSkin infringes AFW's Asserted Patents, and AFW repeatedly tried to resolve the matter without going to court. But RFS never stopped selling DragonSkin; RFS and its distribution arms, Windy City Wire, Cable & Technology Products, LLC ("Windy City") and Talley LLC ("Talley") continued to market and sell DragonSkin, including in Texas, which became one of DragonSkin's most important markets.

[2] The '585 Patent is attached hereto as **Exhibit 1**. The '239 Patent is attached hereto as **Exhibit 2**. The '585 Patent and '239 Patent are referred to herein collectively as the "Asserted Patents."

6. Every DragonSkin sale is a sale taken from AFW, the company that actually did the hard work. AFW now brings this action to hold RFS accountable for its willful infringement. The rewards of AFW's invention should go to the company that did the inventing—AFW—not to the company that simply took what it could not develop itself.

## PARTIES[3]

### AFW

7. Plaintiff AFW is a Nevada company with its principal place of business at 2248 Meridian Blvd, Suite H, Minden, Nevada 89423.

8. AFW is the sole owner of all rights, title, and interests in and to the Asserted Patents.

### RFS

9. Defendant RFS is a corporation organized and existing under the laws of Delaware with a principal place of business at 200 Pond View Drive, Meriden, Connecticut 06450.

10. RFS imports, makes, uses, offers for sale, and/or sells a family of fire-resistant coaxial cables that are marketed under the "DragonSkin" brand name (the "Accused Products").

11. RFS has committed acts of infringement in the Eastern District of Texas, including, for example, by offering to sell and selling the Accused Products in this District. RFS also imports, makes, uses, offers for sale, and sells the Accused Products and thus places them in the stream of commerce with the intent that the Accused Products will be sold and used in this state and specifically in this District, and further with the knowledge that a material portion of the Accused Products in fact are sold and used in this state. Indeed, RFS publishes information on its

[3] RFS, Windy City, and Talley, along with Amphenol Corporation ("Amphenol") and RFS Holdings GmbH ("RFS GmbH") are collectively referred to herein as "Defendants" and each individually is a "Defendant."

DragonSkin-branded website touting more than 41,000 deployments of the Accused Products in this state. *See, e.g.*, https://dragonskincable.com/dragons-lair/ (last accessed October 12, 2026):




12. RFS has a regular and established place of business at which it has committed acts of infringement and places the Accused Products into the stream of commerce throughout the state of Texas and specifically in the Eastern District of Texas.

13. For example, the home(s) and car(s) of its employees, including at least of Christian Barb (RFS's VP Sales and Marketing), are each a regular and established place of business located in this District.

14. As shown above, Texas is one of RFS's most important sales territories for the Accused Products. On information and belief, RFS intentionally locates sales personnel, including Mr. Barb, in Texas in order to better serve this high-priority market. *See, e.g.*:




15. On information and belief, RFS's personnel in this District, including at least Mr. Barb, store samples of Accused Products, company documents, and/or other marketing and promotional materials (such as branded swag and convention-booth decorations) in their homes and cars. *See, e.g.*, the samples, company documents, and other marketing and promotional materials below:





On information and belief, RFS is aware of and expects that its sales personnel store such company material in their homes and cars, so that its sales personnel are able to directly distribute materials to and better engage with current and prospective customers.

16. On information and belief, RFS's personnel in this District, including at least Mr. Barb, conduct business from their home and car located in this District, including regularly offering to sell and selling the Accused Products. RFS's personnel in this District, including at least Mr. Barb, perform their job duties substantially every business day of the year except for occasional personal days and holidays, because selling and marketing RFS's products, including specifically the accused DragonSkin products, is their primary job responsibility. As part of the job responsibilities performed from their homes and cars, RFS's personnel in this District, including at least Mr. Barb, accepts orders, makes business decisions, solicits customers, offers products for sale, and/or take part in industry events on behalf of RFS.

17. Mr. Barb's home and car have been a regular and established place of business for RFS since at least 2020, because Mr. Barb's home and his car have been substantially continuously present in this District, from which he has been leading the sales and marketing function for RFS, including as to the Accused Products, since at least 2020.

18. On information and belief, RFS ratified at least Mr. Barb's home and car as its regular and established place of business.

19. Additionally or in the alternative, as further discussed below, the locations of Amphenol, Windy City, and Talley are also regular and established places of business of RFS, including the facilities in this District, by virtue of ratification, lack of corporate separateness, alter ego, and/or agency, including with respect to the activities conducted on RFS's behalf at those facilities.

<u>RFS GmbH</u>

20. On information and belief, Defendant RFS GmbH is a corporation organized and existing under the laws of Germany.

21. On information and belief, RFS is a wholly owned subsidiary of RFS GmbH, and RFS is RFS GmbH's agent or, alternatively, alter ego. On information and belief, RFS GmbH has no operations separate from RFS; RFS GmbH acts solely through RFS.

22. On information and belief, RFS GmbH does not commercially distinguish itself from RFS. For example, RFS GmbH intentionally includes "RFS" in its name so that the public does not distinguish it from RFS. As a further example, RFS and RFS GmbH do not distinguish themselves in at least certain government filings, such as SEC filings. *See, e.g.*, https://www.sec.gov/Archives/edgar/data/820313/000110465926013549/aph-20251231xex21d1.htm (last accessed October 12, 2026).

<u>Amphenol</u>

23. Defendant Amphenol is a corporation organized and existing under the laws of Delaware with a principal place of business at 358 Hall Avenue, Wallingford, Connecticut 06492.

24. Amphenol has a regular and established place of business in this District, including at least at 859 State Hwy 121, Building 2, Allen, Texas 75013 (the "Allen Facility").

25. On information and belief, Amphenol is RFS's parent and/or affiliate that lacks corporate separateness and does not follow all corporate formalities; alternatively, RFS is Amphenol's agent.

26. For example, RFS's logo, public branding, and public presence and statements convey that it is merely a division / business line within Amphenol, not a formally separate corporate entity. *See, e.g.*, https://www.rfstechnologies.com/ (last accessed October 12, 2026):

RFS Technologies
an Amphenol Company

27. On information and belief, RFS uses Amphenol employees and resources to further its business operations without separately compensating them. For example, RFS states that it is "part of the global Amphenol family" and thus "has access to RF and Fiber Optics experts across the globe" from a number of "sister" businesses under the Amphenol umbrella. *See* https://www.rfstechnologies.com/articles/blog/sister-companies (last accessed October 12, 2026). As a further example, Amphenol markets, offers to sell, and sells the Accused Products on its website. *See, e.g.*, https://www.amphenol.com/products/raw-cable (last accessed October 12, 2026). As a further example, Craig A. Lampo is the CFO of both Amphenol and RFS. As a further

example, Gary Voccio, who purports to be employed by Amphenol,[4] holds himself out as also the "VP of Tax" for RFS and files RFS's Texas Franchise Tax Public Information Report. As a further example, Lance E. D'Amico is the Secretary for both Amphenol and RFS. On information and belief, RFS does not separately pay for these individuals' services because it commingles resources and employees with Amphenol due to lack of corporate separateness or, in the alternative, because RFS is Amphenol's agent.

28. Amphenol does not hold out to the world its corporate separateness from RFS. For example, Amphenol's public 10-K filing with the Securities and Exchange Commission does not break out RFS separately, instead providing "consolidated financial statements" that includes RFS's financials and even defining "Amphenol" and the "Company" as including its subsidiary RFS. *See, e.g.*, https://s21.q4cdn.com/564806605/files/doc_financials/2025/ar/3950aaf3-4fb4-4eb3-9f36-fa1294b5197e.pdf at 60-61 (last accessed October 12, 2026). As a further example, Amphenol divisions publicly tout the relatedness of "Other Amphenol Divisions," which provide Amphenol with a "diversified presence" in various markets, further confirming a fluidity among employees and business lines and also a lack of corporate separateness and observance of corporate formalities. *See, e.g.*, https://www.fibersystems.com/other-amphenol-divisions/ (last accessed October 12, 2026).

29. On information and belief, at Amphenol's direction and as Amphenol's agent, RFS makes, offers for sale, and/or sells substantial volumes of the Accused Product, including in this state and in this District. In the alternative, Amphenol and RFS lack corporate separateness such that RFS's making, offers for sale, and sales of Accused Products in this state and in this District are imputed to Amphenol.

[4] *See, e.g.*, https://www.linkedin.com/in/gary-voccio-b14546235/ (last accessed October 12, 2026).

30. Because Amphenol and RFS lack corporate separateness or, alternatively, because RFS is Amphenol's agent, the Allen Facility is RFS's regular and established place of business, in addition or in the alternative to Amphenol's. In addition or in the alternative, on information and belief, RFS conducts business in the Allen Facility and has ratified the Allen Facility as its own.

## Windy City

31. Defendant Windy City is a corporation organized and existing under the laws of Delaware with a principal place of business at 386 International Blvd, Suite H, Bolingbrook, Illinois 60440.

32. Windy City distributes the Accused Products in this District on RFS's behalf, fulfilling orders placed by RFS's customers and thus acting as RFS's agent. Windy City additionally offers for sale, sells, advertises, and markets the Accused Products.

33. Windy City has a regular and established place of business in this District, including at least at 1800 10th Street, Suite 400, Plano, Texas 75074 (the "Plano Warehouse"). This regular and established place of business functions at least as a "stocking location"[5] where Windy City stores Accused Products for distribution to customers in this state and specifically within this District. On information and belief, Windy City further offers for sale and sells Accused Products from the Plano Warehouse.

34. In addition or in the alternative, the Plano Warehouse is also RFS's regular and established place of business. RFS exclusively distributes to end-customers in this District through its distribution arms, including Windy City acting as RFS's agent, which provides commercial-scale warehousing and distribution services in this District that RFS is not otherwise presently able

[5] *See, e.g.*, https://windycitywire.com/contact/locations (last accessed October 12, 2026).

to fulfill on its own. RFS further holds out the Plano Warehouse as its place of business by listing it on its website. *See, e.g.*, https://www.rfstechnologies.com/company/offices/north-america/distributors (last accessed October 12, 2026).

35. In addition or in the alternative, RFS also conducts business in the Plano Warehouse and has ratified the Plano Warehouse as its own. For example, on information and belief, RFS stores Accused Products in the Plano Warehouse before title to the Accused Products passes to Windy City or to any end-customer.

36. Windy City also sells various DAS accessories that are especially adapted to work with the Accused Products, such as connectors and specialized installation tools. Windy City tries to drive sales of the Accused Products, as well as related sales of other products including products especially adapted to work with the Accused Products, by marketing its ability to be "a single B2B partner" for end-customers across a wide range of products. *See, e.g.*, https://windycitywire.com/products/das/dragonskin (last accessed October 12, 2026).

Talley

37. Defendant Talley is a corporation organized and existing under the laws of California with a principal place of business at 12976 Sandoval Street, Santa Fe Springs, California 90670.

38. Talley distributes the Accused Products in this District on RFS's behalf, fulfilling orders placed by RFS's customers and thus acting as RFS's agent. Talley additionally offers for sale, sells, advertises, and markets the Accused Products.

39. Talley has a regular and established place of business in this District, including at least at 500 Tittle Rd, Suite 300, Lewisville, Texas 75056 (the "Lewisville Warehouse"). On information and belief, this regular and established place of business functions at least as a stocking

location where Talley stores Accused Products for distribution to customers in this state and specifically within this District. On information and belief, Talley further offers for sale and sells Accused Products from the Lewisville Warehouse.

40. In addition or in the alternative, the Lewisville Warehouse is also RFS's regular and established place of business. RFS exclusively distributes to end-customers in this District through its distribution arms, including Talley acting as RFS's agent, which provides commercial-scale warehousing and distribution services in this District that RFS is not otherwise presently able to fulfill on its own. RFS further holds out the Lewisville Warehouse as its place of business by listing it on its website. *See, e.g.*, https://www.rfstechnologies.com/company/offices/north-america/distributors (last accessed October 12, 2026). RFS further holds out Talley as RFS's agent for purposes of offering to sell and selling the Accused Products, for example by listing on RFS's website a link to purchase the Accused Products directly through Talley's website (and not through RFS's own website). *See, e.g.*, https://www.rfstechnologies.com/searchengine/dragonskin-1-2-cable (last accessed October 12, 2026).

41. In addition or in the alternative, RFS also conducts business in the Lewisville Warehouse and has ratified the Lewisville Warehouse as its own. For example, on information and belief, RFS stores Accused Products in the Lewisville Warehouse before title to the Accused Products passes to Talley or to any end-customer.

42. Talley also sells various DAS accessories that are especially adapted to work with the Accused Products, such as connectors and specialized installation tools. On information and belief, Talley tries to drive sales of the Accused Products, as well as related sales of other products including products especially adapted to work with the Accused Products, by marketing its ability to provide end-customers a wide range of products. *See, e.g.*, https://www.talleycom.com/ (last

accessed October 12, 2026).

## JURISDICTION AND VENUE

43. This is an action for patent infringement arising under the patent laws of the United States. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

44. This Court has personal jurisdiction over each Defendant because each Defendant conducts business in and has committed acts of patent infringement in this District and has established at least minimum contacts with this forum state such that the exercise of jurisdiction over each Defendant would not offend the traditional notions of fair play and substantial justice. Upon information and belief, each Defendant transacts substantial business with entities and individuals in the Eastern District of Texas, by, among other things, making, using, importing, offering to sell, and/or selling the Accused Products which infringe the Asserted Patents.

45. Each Defendant is subject to this Court's general and specific jurisdiction pursuant to due process and/or Tex. Civ. Prac. & Rem. Code § 17.041 *et seq.* (the Texas Long Arm Statute) due at least to each Defendant's substantial business in this District, including through their past and ongoing infringing activities, because each Defendant regularly conducts business in this District and/or because each Defendant has engaged in persistent conduct and/or has derived substantial revenues from Accused Products knowingly provided to end-customers in this District.

46. In the alternative, this Court has personal jurisdiction over RFS GmbH under Federal Rule of Civil Procedure 4(k), because the claims for patent infringement in this action arise under federal law, RFS GmbH is not subject to the jurisdiction of courts of general jurisdiction of any state, and exercising jurisdiction over RFS GmbH is consistent with the U.S. Constitution.

47. Venue is proper in this District pursuant to 28 U.S.C. § 1400 as to at least RFS,

Amphenol, Windy City, and Talley, because they have all committed acts of infringement in this District and have a regular and established place of business in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391(c)(3) as to RFS GmbH, because RFS GmbH is a foreign entity that does not reside in the United States.

## THE ASSERTED PATENTS

48. The Asserted Patents address a critical, lifesaving need that was not addressed by the prior art. As the Asserted Patents explain:

> Since the Sep. 11, 2001 attacks on the World Trade Center and Pentagon, there has been a world-wide emphasis on improving communications during emergencies. In the first minutes of an emergency, communication among civilians and first responders is often through wireless communication devices, such as cellular telephones. While wireless signals, being electromagnetic radiation typically in the radio frequency (RF) range, are impervious to damage and do not depend on wires for transmission, the wireless signals depend on other infrastructure to communicate. This infrastructure includes antennas, switching equipment, towers, repeaters—and wires.
>
> Ground zero of a disaster, man-made or natural, is often localized to a particular geographic area. At least some local cell towers may be operational. But cell phones within large buildings often do not connect directly with cell towers. Such buildings, as well as shopping centers and stadiums, may have too many obstacles and reflections for conventional cell phone-to-tower connections. For example, the metal reflective film applied to glass facades of commercial buildings prevents transmission of RF energy outside the building. Or the buildings may simply be too large for RF signals to reach a nearby cell tower, such as is the case with stadiums.
>
> A cellular distributed antenna system (DAS) is often employed within buildings and other facilities in order to facilitate transmission of signals between occupants' cell phones and local cell towers. Multiple antennas are located throughout the facility, such as on each floor. Signals to and from the distributed antennas are routed—by cable—through a central processing rack in the basement or on the first or top floor. One or more cables connects the central processing rack to an outside antenna that is pointed or otherwise configured to optimally communicate with a local cell

> tower. The outside antenna is often located on a building's roof.
>
> An Emergency Responder Radio Coverage System (ERRCS) DAS may also be employed within facilities. An ERRCS DAS boosts radio signals for firemen, policemen, and other first responders, similarly to a cellular DAS.
>
> If there is an emergency in the building, a DAS may be critical for communications. Firefighters and policemen need to communicate with one another while responding. Users should be able to communicate with the outside as well. It may be especially unnerving for users to have their otherwise-normally-operational cell phones experience an outage during a building emergency.
>
> It is for these and other reasons that building fire codes require DASes to meet certain survivability standards. For example, building fire codes sometimes dictate that communication cables connecting the DAS's antennas to the central processing/head-end rack and communication cables running from the rack to the outside antenna maintain operation at 1010° C. (1850° F.) temperatures for two hours. This standard can be found among the NFPA 72 (National Fire Alarm and Signaling Code), ICC IFC 510 (International Fire Code), and NFPA 1221 (Standard for the Installation, Maintenance, and Use of Emergency Services Communications Systems) codes.
>
> Yet no such fire-resistant cables exist in a coaxial configuration. To maintain spacing between the central and outer conductors, common coax cables employ dielectrics that are air-based (foam) or polymer. Plastic foam and polymers simply melt at high temperature. Therefore, in one large city with such building codes, building inspectors routinely grant waivers for DAS coax cables or require extensive fire shielding of the cables, such as boxing them in drywall soffits, to afford them the two-hour burn time.
>
> There is a need in the art for more survivable coax communication cables.

'585 Patent at 1:28-2:30.

49. The Asserted Patents satisfied this dire need in a new and non-obvious way, with an arrangement that was not well-known, routine, or conventional. Before AFW developed the technology claimed in the Asserted Patents, there was no known standalone coaxial cable that

could satisfy the 2-hour fire survivability standards required by building codes.

50. The Asserted Patents are valid and enforceable in the United States. The Asserted Patents have not expired and are not the subject of any proceeding before the United States Patent and Trademark Office.

**DEFENDANTS' WILLFUL INFRINGEMENT**

51. AFW set out to solve the long-felt-but-unmet need described above, and by 2016 had found a solution as claimed in the Asserted Patents. While AFW worked to put its innovation into commercial production, AFW began marketing its technology, including at industry trade shows. AFW's innovation started generating substantial buzz in the industry.

52. On information and belief, RFS heard about AFW's innovative technology and immediately recognized its immense value. Between at least 2018-2019, RFS employees, including at least Drausio Castro, falsely posed as potential customers of AFW's in order to learn more about AFW's technology. Employees such as Mr. Castro concealed their relationship to RFS in order to solicit more information about AFW's technology, including, for example, by signing up to receive information from AFW using their personal email address, instead of their RFS business email address.

53. On information and belief, RFS studied AFW's patented technology and copied it in order to launch its infringing DragonSkin product around April 2020.

54. In December 2020, AFW notified RFS that its DragonSkin products were infringing each of the Asserted Patents.

55. AFW and RFS began communicating about RFS's infringement of the Asserted Patents. During the course of those discussions, RFS never provided a good-faith, objectively reasonable justification for its infringing actions. Despite AFW's persistent attempts to resolve

the situation, RFS refused to stop infringing notwithstanding its knowledge that it was infringing both of the Asserted Patents.

56. RFS has had knowledge of its infringement of the Asserted Patents since at least December 2020, when AFW expressly provided such notice. On information and belief, RFS has also had actual, constructive, and/or inquiry knowledge of, or at least been willfully blind to and reckless about, its infringement since it launched the Accused Products on or around April 2020, for example because RFS had been studying AFW's patented technology.

57. On information and belief, Amphenol, RFS GmbH, Windy City, and Talley have each willfully infringed by virtue of their relationship with RFS as described above. In addition or in the alternative, they have each been at least willfully blind to and reckless about their infringement of the Asserted Patents, including because they were aware that RFS had competitors in the market and that AFW's products were marked with the Asserted Patents. They have also all had actual knowledge of their infringement of each of the Asserted Patents at least since the filing of this Complaint.

58. AFW has at all relevant times complied with 35 U.S.C. § 287, to the extent applicable. For example and without limitation, AFW notified RFS of RFS's infringement in December 2020, yet RFS continued to infringe thereafter notwithstanding such notice. As a further example and without limitation, to the extent AFW's fire-resistant coaxial cable embodied one or both of the Asserted Patents, AFW adequately complied with any applicable marking requirements of 35 U.S.C. § 287 as to at least substantially all such cable.

**COUNT 1**
**INFRINGEMENT OF U.S. PATENT NO. 9,773,585**

59. Plaintiff repeats and incorporates by reference each preceding paragraph as if fully set forth herein.

60. Defendants have infringed and continue to infringe at least claim 18 of the ’585 Patent in violation of 35 U.S.C. § 271, literally and through the doctrine of equivalents, by importing, making, using, selling, and/or offering for sale in the United States, without authorization, the Accused Products.

61. Defendants are liable for infringing the ’585 Patent pursuant to at least 35 U.S.C. § 271(a), (b), and/or (c). Defendants directly infringe under § 271(a) because they import, make, use, sell, and/or offer to sell the Accused Products which satisfy every limitation of at least claim 18 of the ’585 Patent. Defendants indirectly infringe under § 271(b) because they actively induce, with knowledge of infringement and specific intent to induce infringement by, for example, end-customers and others to use and/or make the Accused Products (for example by providing technical specifications, installation guidance, and/or marketing materials). Defendants indirectly infringe under § 271(c) because they make, offer to sell, and/or sell the Accused Products, which constitute a material part of the invention in the ’585 Patent, with knowledge that the Accused Products are especially made or especially adapted for use in an infringement of at least claim 18 of the ’585 Patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

62. The Accused Products are fire-resistant coaxial cables. *See, e.g.*, https://dragonskincable.com/ (last accessed October 12, 2026) (“RFS Technologies coaxial cables are recognized around the world for their ability to meet key fire safety standards.”).

63. The Accused Products comprise: a center conductor; a ceramic fiber wrap dielectric surrounding the center conductor; and an outer conductor surrounding the dielectric; and a ceramic fiber wrap inner jacket surrounding the outer conductor. *See, e.g.*, https://www.youtube.com/watch?v=oObMupFis5w&t=180s (last accessed October 12, 2026):



(3:27)



(3:17)

64. In the Accused Products, the ceramic fiber wrap dielectric is configured to maintain a predetermined spacing between the center conductor and the outer conductor, the predetermined spacing fixed at a constant between 3.4 millimeters and 7.6 millimeters. *See, e.g.*, https://dragonskincable.com/assets/downloads/RFSTech_2HB12-50JPLR_DragonSkin_datasheet_revG.pdf (last accessed October 12, 2026):

| STRUCTURE | | |
|---|---|---|
| Cable Type | | Air-Dielectric, Corrugated |
| Size | | 1/2" |
| Inner Conductor | mm (in) | 4.8 (0.19) Copper Wire |
| Dielectric | mm (in) | 11.81 (0.465) |
| Outer Conductor | mm (in) | 13.8 (0.54) Corrugated Copper |

[6]

[6] *E.g.*: 11.81mm – 4.8mm = 7.01 mm, divided by 2 = 3.505 mm.

65. Defendants committed the foregoing infringing acts without license from AFW. Defendants' acts of infringement have damaged AFW. AFW is entitled to recover from Defendants the damages AFW has sustained as a result of their willful infringement in an amount to be proven at trial.

66. Defendants' infringement of the '585 Patent has irreparably harmed AFW, and Defendants' ongoing infringement of the '585 Patent will continue to irreparably harm AFW. As a direct result of Defendants' infringement, AFW has suffered and continues to suffer loss of market share, price erosion, and/or loss of goodwill and brand reputation. AFW's harm cannot be adequately remedied in full through monetary damages alone.

## COUNT 2
## INFRINGEMENT OF U.S. PATENT NO. 10,283,239

67. Plaintiff repeats and incorporates by reference each preceding paragraph as if fully set forth herein.

68. Defendants have infringed and continue to infringe at least claim 13 of the '239 Patent in violation of 35 U.S.C. § 271, literally and through the doctrine of equivalents, by importing, making, using, selling, and/or offering for sale in the United States, without authorization, the Accused Products.

69. Defendants are liable for infringing the '239 Patent pursuant to at least 35 U.S.C. § 271(a), (b), and/or (c). Defendants directly infringe under § 271(a) because they import, make, use, sell, and/or offer to sell the Accused Products which satisfy every limitation of at least claim 13 of the '239 Patent. Defendants indirectly infringe under § 271(b) because they actively induce, with knowledge of infringement and specific intent to induce infringement, for example, end-customers and others to use and/or make the Accused Products (for example by providing technical specifications, installation guidance, and/or marketing materials). Defendants indirectly infringe

under § 271(c) because they make, offer to sell, and/or sell the Accused Products, which constitute a material part of the invention in the '239 Patent, with knowledge that the Accused Products are especially made or especially adapted for use in an infringement of at least claim 13 of the '239 Patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

70. The Accused Products are fire-resistant coaxial cables. *See, e.g.*, https://dragonskincable.com/ (last accessed October 12, 2026) ("RFS Technologies coaxial cables are recognized around the world for their ability to meet key fire safety standards.").

71. The Accused Products comprise: a center conductor; a ceramic fiber wrap dielectric surrounding the center conductor; and an outer conductor surrounding the dielectric; and a ceramic fiber wrap insulating jacket comprising fiber material selected from the group consisting of refractory aluminoborosilicate, aluminosilica, and alumina surrounding the outer conductor. *See, e.g.*, https://www.youtube.com/watch?v=oObMupFis5w&t=180s (last accessed October 12, 2026):



(3:27)



(3:17)

72. In the Accused Products, the ceramic fiber wrap dielectric is configured to maintain a predetermined spacing between the center conductor and the outer conductor when heated above 1010° C. *See, e.g.*, https://dragonskincable.com/assets/downloads/RFSTech_2HB12-50JPLR_DragonSkin_datasheet_revG.pdf (last accessed October 12, 2026):

**FIRST UL LISTED STANDALONE COMMUNICATIONS CABLE MEETING NFPA 72 AND 1221 SURVIVABILITY STANDARD**
VERIFIES THE CABLE SURVIVES 2 HOURS AT TEMPERATURES UP TO 1,850 DEGREES F AND THE WATER SPRAY TEST WITHOUT CONDUIT OR ADDITIONAL WRAPPING

| STRUCTURE | | |
|---|---|---|
| Cable Type | | Air-Dielectric, Corrugated |
| Size | | 1/2" |
| Inner Conductor | mm (in) | 4.8 (0.19) Copper Wire |
| Dielectric | mm (in) | 11.81 (0.465) |
| Outer Conductor | mm (in) | 13.8 (0.54) Corrugated Copper |

73. Defendants committed the foregoing infringing acts without license from AFW. Defendants' acts of infringement have damaged AFW. AFW is entitled to recover from Defendants the damages that AFW has sustained as a result of their willful infringement in an amount to be proven at trial.

74. Defendants' infringement of the '239 Patent has irreparably harmed AFW, and Defendants' ongoing infringement of the '239 Patent will continue to irreparably harm AFW. As

a direct result of Defendants' infringement, AFW has suffered and continues to suffer loss of market share, price erosion, and/or loss of goodwill and brand reputation. AFW's harm cannot be adequately remedied in full through monetary damages alone.

## DEMAND FOR JURY TRIAL

75. AFW hereby demands a jury trial for all claims and issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, AFW requests entry of judgment in its favor and against Defendants as follows:

A. Declaring that each Defendant has infringed, and continues to infringe, each of the Asserted Patents, directly and indirectly;

B. Awarding damages to Plaintiff to compensate Plaintiff for Defendants' infringement of the Asserted Patents, including lost profits damages, reasonably royalty damages, and/or price erosion damages, and further including prejudgment and post-judgment interest;

C. Declaring that each Defendant's infringement of each of the Asserted Patents has been, and continues to be, willful;

D. Awarding treble damages to Plaintiff for Defendants' willful infringement, including pursuant to 35 U.S.C. § 284;

E. Ordering Defendants to pay ongoing and supplemental damages to Plaintiff, with interest, and an accounting;

F. Awarding attorney's fees, costs, and expenses pursuant to 35 U.S.C. § 285 and as otherwise permitted by law;

G. Permanently enjoining, under 35 U.S.C. § 283 or other inherent or statutory authority,

each Defendant from infringing each of the Asserted Patents; and

H. Awarding other amounts and further legal and equitable relief as the Court may deem just and proper.

Dated: October 13, 2026

Respectfully submitted,

*/s/ Josh Glucoft by permission Claire Henry*
Josh Glucoft
Orrick, Herrington & Sutcliffe LLP
355 S. Grand Ave.
Ste. 2700
Los Angeles, CA 90071
T +1 213-612-2102
M +1 310-497-1143
joshua.glucoft@orrick.com

*Of Counsel:*

Claire Abernathy Henry
Texas State Bar No. 24053063
MILLER FAIR HENRY PLLC
1507 Bill Owens Pkwy.
Longview, TX 75604
Tel: (903) 757-6400
claire@millerfairhenry.com

***Attorneys for American Fire Wire, Inc.***